Good morning, your honors. Steve Reed on behalf of the appellants. Your honors, in a single order, the district court certified two classes. A class of 84 large drug wholesalers who are suing under federal law. They're referred to as the DPPs. And a class of more than 300,000 third party payers and consumers who are suing under various state laws. We refer to them as the EPPs. Both classes were error and should be reversed and I'll address each of them separately. I'll start with the DPPs because I think they can be relatively quickly dispensed with under well-established law in this circuit. There's two problems with the DPP class. First, it's overbroad. It's overbroad because 54 of the 84 members lack antitrust standing under the Efficient Enforcer Test. The Efficient Enforcer Test, as this court has recognized time again, is fundamentally one of proximate causation. And proximate causation in this circuit is determined under the First Step Rule that was articulated back in 2020 by American Express, by this court in American Express, and reaffirmed by this court multiple times since. The First Step Rule is a bright line rule. This court, as it said expressly, draws a bright line between those who transact with the defendants and those who don't. Okay, so there's a lot of back and forth on the brief on this. So, yes, I'm conceding from the jump that you have cases like Emmex, you have Schwab, you have Layden, you have Sullivan, but we also have cases like Platinum and Palladium and DDAVP and it is part of our job to harmonize them. So if you can explain to me what you think our rule is that accounts for the positions that have been taken in all of those cases. Of course, Your Honor. Thank you for that question. So, I believe they absolutely can be read in harmony and they can be reduced to the basic proposition that I stated, which is that where there is an intervening third party making a separate pricing decision, that breaks the chain of causation for persons of proximate causation under the efficient enforcer of test. Platinum is a wonderful example because there's two sets of defendants in that case, or two sets of plaintiffs in that case, excuse me. The allegations in that case is that the defendant manipulated a futures market. There were purchasers in the physical market who claimed that the prices that they paid were inflated and that there was a direct correlation between the prices that they paid and the alleged manipulation in the futures market. And this court said, you failed that test because you transacted on the physical market. You did not transact directly with the defendant. The second set of plaintiffs in that case were plaintiffs who transacted on the same market that the defendant did, the futures market. The only slight twist, and it really is a slight twist, is that under the rules of that market, there was a single clearinghouse that had to act as the clearinghouse for all transactions. But as this court said, that was just a mere conduit. It was a mere conduit for transactions between the plaintiffs and the defendants in the same market. The direct counterparties in those transactions, for purposes of this court's first step rule, were the plaintiffs and the defendants. The defendants profited from those transactions, which was important to this court, and the purpose of the alleged scheme was to make profits in those transactions. Your Honor, you mentioned DDAVP. That was decided before American Express, and in that decision, it's very clear that the plaintiffs actually transacted directly with the defendants. There was a direct relationship with them that's lacking here. Your Honor, there's a recent decision from this court that's not in the papers because it was decided after the briefs were filed, and that involves DIRECTV. And I expect that my friends on the other side will point to that as an exception as well, but it's absolutely not. In that decision, the DIRECTV decision, this court reaffirmed the basic principle underlying American Express, and Schwab, and Platinum, and Laden, and Sullivan, that there must be a direct connection between the plaintiffs and the defendants. But this is the argument, and I am, you know what, I'll let you finish DIRECTV, but I am going to follow up. Please, go ahead. My apologies. Yeah, you don't need to apologize. So, DIRECTV was a somewhat unique situation in that the theory of recovery there was lost profits. DIRECTV had a direct relationship. It was a customer-seller relationship with the plaintiff. The scheme alleged against the seller was to drive up the prices paid by the plaintiff, excuse me, the defendant sought to drive up the prices paid by the plaintiff. The plaintiff refused to pay those inflated prices, and as a result, lost profits. But there, again, the main question for this court was whether lost profits was a cognizable remedy under the antitrust laws, and in looking at the approximate cause analysis, the court said, well, these plaintiffs were the direct target of that conduct. They have a direct relationship with those defendants, and there was nobody else to be harmed in the transaction. Let's assume for the DPPs that you had a class of not 40, but 30. What makes that unmanageable? What makes that unmanageable? Well, I think, Your Honor, that's a fact question, and under the well-settled law, the plaintiffs have the burden of proof of persuading the district court, by preponderance of the evidence, that it would be impractical for that class to proceed, excuse me, for that group of plaintiffs to proceed in a jointer action as opposed to a class. The plaintiffs have to actually provide evidence, and the court needs to apply appropriate considerations. Here, because the court never got to the question, because the plaintiffs didn't even try to argue that a class of 30 sophisticated drug wholesalers who actually transacted with Takeda could not proceed in a jointer action. They didn't even try. That wasn't before the court. The court didn't analyze it, because there was no evidence or argument making that assertion. Their position was that the class had to be these 84, which included, as I said, 54 who never transacted with Takeda. They only bought from generic, third-party generic manufacturers who set their own prices. And the evidence is clear. There's a suggestion in their papers that there's some unitary price. Absolutely not. Their expert, Professor Rosenthal, admitted that there was no single generic price. Our prices with generics vary dramatically, manufacturer by manufacturer, and customer by customer, which shows that those who independently set prices, independently negotiated prices, that Takeda didn't influence. And Takeda didn't profit. This is important. You see this in Platinum. You see this in Schwab. It's important whether the defendant profited from the transactions. Here, there's no allegation that Takeda profited from those transactions with third parties. Well, I guess, could you address the lower court? I mean, I get the argument that our precedents have a pretty firm first step rule, that the defense should have been honored. But there's some appeal to the argument that in a market exclusion case, it might just be difference, and we haven't addressed that. So, Your Honor, I think what Judge Abrams picked up on was language from the Third Circuit's medaphinal position. The Third Circuit, obviously, is not the Second Circuit. It has not adopted the bright line rule that this Court has adopted. And in that case, the medaphinal involved a series of bilateral conspiracies, and the generic defendants were in that case. But more importantly, I think the focus on so-called market exclusion mixes apples and are claiming that they paid an inflated price because generic competition was delayed. That's the foreclosure. The 54 who only ever bought generics were not foreclosed from buying generics by definition. What they're claiming is at the point in time when they were allowed to buy generics, the prices were higher than they otherwise would be, which is exactly the argument that the set of plaintiffs in American Express, who this Court found They said, but for American Express's conduct, if anti-steering rules applied to merchants who used American Express, these other card companies would have charged us less. Now, some courts, this Court has talked about that in terms of umbrella damages. Plaintiffs have taken issue with that characterization. It doesn't matter. It's the first step rule. It's approximate causation. It's about as well established over the last six years from this Court as any principle. Right, but I think, and the question that I think my colleague was asking was whether or not we have applied the, we have set a clear standard when we're dealing with a market exclusion theory, and why, and if that's the case, why, if we have set a rule, like where do you think is the best proposition for the fact that we have specifically contemplated that particular scenario, and if we haven't, then why do we extend the doctrine this way? Thank you for that question. So, I think the distinction between price fixing and market exclusion is an artificial one. It does not make a difference, and it doesn't fit the case law. American Express was not a price-fixing case. HUA was not a price-fixing case. Platinum was not a price-fixing case. You can't dismiss this as a rule that only applies to price-fixing cases. If you want to focus on a kind of unifying element, it's the fact that they're seeking overcharge damages based upon prices they paid, which they say are too high, and then the question becomes, well, who did you pay? If you transact, if you paid Takeda, if you negotiated with Takeda, and you say the price that we charged was too high because of anti-competitive conduct, that's one thing. If you're saying the price that we negotiated, and by the way, these are typically done by purchase contract negotiation, the price we negotiated with third-party manufacturers that had nothing to do with Takeda was too high because of the pricing decisions they made based on what Takeda did, you're no longer sufficiently proximate. You're on the wrong side of the first step rule. I don't think, Your Honor, respectfully, you need to change your rule. You've articulated it six times in the last five years. It's clear, and it clearly applies here. Your Honor, just very briefly, because I know there's some media issues on the Empire class as well, the second way in which the court erred on the direct purchaser action was in its application 23A1. The error there, and this is a consequential issue as well, the error there is that the court did not hold the plaintiffs to their burden of proof that a jointer of this large group of sophisticated wholesalers would be impractical. This is an evidentiary burden. This court's decision in Robodeau makes that clear. The Supreme Court in Wal-Mart said plaintiffs must affirmatively demonstrate compliance with those rules, affirmatively demonstrate. But instead, and as I said, they didn't even try with respect to a class of 30 direct purchasers from Takeda. And even as for 84, what they really did was offer a turning argument, not evidence. There's some... What do you think was missing in that report? Well, thank you for that question. So for your Honor, concrete evidence, for example, one of the arguments they made is that class members would not join a jointer action because they would fear retaliation. They had no evidence whatsoever to that effect. I've been in other cases where class members have put in affidavits and we've had an opportunity to examine that assertion. Another element under Robodeau is whether there's a sufficient financial incentive for class members to participate in a jointer action. And what courts look to there is they look to the value of the claims and the cost to pursue those claims. Well, plaintiffs put in evidence of their estimated value of the claim per class member, but they put no evidence, zero evidence, in as to what it would cost to proceed under a jointer action. You didn't have a presumption, though, about jointer being impractical. So why, with the number that you hit, or would hit here, so why should we take this out of that presumption? So, Your Honor, I have a few reasons. So, first of all, this court in Robodeau said even if you exceed the number, it's not enough. It's not just a numbers game. You need to go through the other Robodeau considerations. And the magistrate judge and the district court judge both recognized that it's a rebuttable presumption. It certainly isn't automatic. Here, they didn't hit that magic number of 40, I would contend, because they included 54 members who don't have antitrust standing. So it really is at most a class of 30, and we put in evidence to our experts to show that it's actually less than 30, but I'm not arguing that here. But in any event, Robodeau and Walmart are very clear that the district court has a duty, the plaintiffs have an evidentiary burden, to show, not tell, that they have met the standard. So I think that presumption doesn't apply here, but even if it did, they haven't provided even a modest amount of evidence to satisfy their obligation. And then very quickly on this issue, and then I'll move on, as to the judicial economy factor, which courts have recognized may be the most important under Robodeau, the district court found that judicial economy favored class certification based on unwarranted assumptions, because the plaintiff didn't give her evidence, and improper considerations, and I want to focus on the improper considerations. What the district court said in her opinion is she said if no class is certified, the court, quote, might face delay and the need for additional counsel discovery and motion practice, close quote. Your Honors, that could be said in any case where class is denied. And particularly after Rule 23 was amended, and class certification motions are filed much later in the life of a case, there's always going to be a concern about additional delay, counsel, etc. The Third Circuit in Modaffino, and here I like that decision, I disagree with them on this, and the irony is not lost on me, but it is a principle difference. The Third Circuit engaged in a principle analysis and concluded that considering delay is an improper consideration because of the amendments to Rule 23. Okay, so with that I'll move on to the NPAERS, Your Honor. So the NPAER class was improper. Okay, I just want to jump, are you asking us to open a circuit split? I'm asking this court to rule correctly. I do believe that that will result in a circuit split, but I'm happy to address, let me do it right now. Lindas and Moussat, the Sixth and Seventh Circuit decisions, I would contend were wrongly decided and also no longer persuasive after the Supreme Court's decision in TransUnion. So they were wrong and they were right. So first of all, what they did, they held that the personal jurisdiction requirement doesn't apply to unnamed class members, and they analogized the personal jurisdiction requirement to the requirements for diversity and amount of controversy. But what they missed, and there was an excellent dissent in Lindas, which I would commend to this court, because the judge there talks about this. Congress passed statutes creating exceptions to those two requirements, the Supplemental Jurisdiction Act and the Class Action Fairness Act. And my basic point, and I will, Your Honor, I will absolutely come back to your question. I know this is an issue of first impression in this court, but the answer flows from settled principles in the Supreme Court's decision in VMS. The district court wrongly concluded that she was not required to consider personal jurisdiction of the claims of unnamed class members. The answer flows. This court has said, well, even after VMS and before that, somewhere in this court, it's clear that personal jurisdiction must exist for all claims before the court, not just parties. This court has said multiple times that that requirement is inflexible and without exception. Rule 23, if you look at Rule 23, it does not contain an exception to personal jurisdiction in class actions. No, but everybody, like Krista Meyer, everybody understands what Rule 23 has worked at. Prior to, Krista Meyer Squibb operated in the backdrop of understanding that unnamed class members did not have to share personal jurisdiction. At best, I think, you could read TransUnion as saying that a class can't be defined to include folks that lack standing. And what I think you're actually asking us to do, and you can tell me if I've gotten it wrong, is to complete the way we understand personal jurisdiction to be dealing with standing, even though they serve different functions. But related functions. They're not complete, but yes, treat them the same way. So, in fact, Lindas and Lissette actually said that, too, believe it or not, Your Honor. No, I'm very familiar with that case. What I'm trying to do is understand how, if we understand standing to be the minimum for a court to exercise its power, and personal jurisdiction to be more of a due process or fairness for the defendants, like why do they need to be viewed one and the same? Well, I don't know if they need to be viewed one and the same, but they should be treated the same way, and I'll explain if I may. So, again, just to go through the progression, this Court has said there's no exception. Rule 23 contains no exception. Unlike with the diversity requirement and the amount of controversy requirements, Congress has not passed an exception. I'm not saying Congress could not. I think that's for another day. But there's no dispute that Congress has not passed an exception, and the Rules Enabling Act prevents the rules from being interpreted to alter a substantive right. And I think it's absolutely clear after BMS that exercising the Southern District of New York, sitting in diversity, exercising personal jurisdiction over the claims of non-resident plaintiffs under non-New York statutes based on transactions that occurred outside of New York against defendants who are not subject to general personal jurisdiction in New York for conduct that did not occur in New York far exceeds the bounds of BMS, and that is a substantive right that is protected by the Rules Enabling Act. Well, I mean, it can't, because BMS specifically said it wasn't dealing with class actions. They made it a point of saying they were dealing with mass actions. And I'm, what I'm not clear on is how we, should Rule 23 be the way? Is that the way we have decided to make sure that the defendants' due process rights are being appropriately attended to? Why is that understanding wrong? Well, I, I want to make sure that I'm answering your question. So, so this is a constitutional right. And I want to, I guess we keep coming back to Lingass, Massat, and whether there's a dis, and transunion, which, and by the way, in this, this court's decision, right? So let me talk again about Lingass and Massat. They drew an analogy instead of to, to, to subject matter jurisdiction. They pointed to diversity. Are we talking about the majority? And I'm happy to talk about the Third Circuit, but let's focus on the Sixth and the Seventh which really deal with, deal with the issues squarely. Fisher was involved. It was, it was FLSA action. There they said, we're going to analogize this to diversity and a mountain of controversy. But the key difference there is that Congress passed exceptions as to those requirements. It has not done so for personal jurisdiction. And then they went further. Both of those courts went further and they said, we think personal jurisdiction should be treated the same way as subject matter jurisdiction. That led them to conclude that there, that you still don't look at, at individual unnamed class members. But in this court, under Denny, this court had already decided that issue. Under Denny, this court had said, you have to consider, and I want to be very clear, you cannot define a class that is defined to include claims as to which the court lacks subject matter jurisdiction. And then TransUnion was decided by the Supreme Court in 2021. It was after Massat, after Lingass, and it came down just as this court had in Denny. And it said, so this whole notion, by the way, that class claims are unitary, there's only one, you don't think about anybody but the named plaintiff. Well, that was put to the lie by TransUnion. I mean, you have to look at, because these are constitutional principles. If we think that TransUnion is a standing case, if we decide that TransUnion is really a standing case rather than a jurisdiction case, do you still prevail? Well, I think the principles still apply. But we made the point, and the plaintiffs did not dispute this. I mean, the courts treat standing in this context as a subject matter jurisdiction. It's Article III standing, it's subject matter jurisdiction. I don't think there's any dispute, certainly among the parties, as to that. And I do think, Your Honor, that this is a really important, again, I want to emphasize, I know that the Supreme Court and BMS expressly said they weren't deciding the issue. Justice Sotomayor predicted that this day would come, because it follows naturally from the principles articulated by the court. Can I ask, I guess I have two questions about specific jurisdictions. First, and I think this is following on my colleague. Just under Rule 23 itself, it amounts to requiring a pretty substantial connection between the defendant and the out-of-state, the non-representative class members. And we already have the dispute itself involving the named class representatives. But these other class members, the rule requires a showing of commonality, and all the requirements that lead to a certification of the class sort of establish an adequate connection. And if that's not right, if those three decisions are wrong, don't we have specific jurisdiction here anyway because of the litigation? So, Your Honor, I think you have to distinguish between the rights of plaintiffs and the rights of defendants. Langan, for example, this court's decision in Langan, which is the plaintiff's site, that involved whether the plaintiff had, there was sufficient commonality over that, etc., so that the named plaintiff had standing to sue in a representative capacity. It didn't deal, and by the way, that was decided after Denny, but it didn't, and could not have overruled Denny implicitly, didn't address Denny. The point there is that there's a very different focus, and part of the concern that the court must have in a class action is whether it has authority to bind the absent plaintiffs with any judgment. It's a wholly different analysis when we're talking about a defendant's right not to be hailed into court to answer to hundreds of thousands of claims by foreign residents, under foreign laws, in a foreign jurisdiction. That's exactly what BMS faced in the state court action in California. I understand it was a mass action, but the 14th Amendment principle still applied here in a diversity case. I get that, and I guess I'm asking why the, whether the requirements of class certification itself aren't enough to, in some way, distinguish the mass action from a class certification, and that the defendants, because they establish specific jurisdictions, they establish a connection that the defendant has with those out-of-state class members, and if that's not enough, then in this case, the fact that your client was involved in litigation in New York that could be in furtherance of what the plaintiffs allege is the market exclusion scheme, then wouldn't that be enough in this case that we don't even have to reach the typical question that we, I agree, will someday have to be reached because of Bristol-Myers? Your Honor, I'm hoping today is the day. I understand that it is consequential, and so I appreciate the court's careful consideration. I have two answers to that question. So first of all, if you were to infer somehow that Rule 23 allows the district court to do what you just described, I would respectfully say you're violating the Rules Enabling Act because you're altering Takeda's substantive right, which the Rules Enabling Act says you may not do. The other point I would make is, as VMS made clear and as this court held in Sunward, the court needs to assess personal jurisdiction claim by claim, not just party by party. So the fact that we're here, we, the defendants, are here for one thing, no matter how similar to these other claims, does not give a court sitting in diversity authority over Takeda. Where is the best authority you have for that proposition? That you have not either, you're either stopped or that you have established significant connections by the lawsuit on a case that is very, very similar and very, very related. Yeah, so I think what you would have to do, again, because the court, this court, and the Supreme Court requires a claim by claim analysis, and because the court- I'm sorry, just in case you're sober time, what is the authority that you think best supports that proposition? I'm struggling a little bit because I think the proposition you articulated is not one that I share. So the proposition that you said that we have to, it doesn't matter, I wish I could have somebody read exactly what you said, I'm actually not trying to push against your statement. No, I understand. The idea of, it doesn't matter if you come into a court asserting a lawsuit on a similar claim, that does not enough to establish jurisdiction. Yeah, so I'll give you two cases. The Supreme Court's decision in Bristol-Myers Squibb was exactly that. There were California residents who sued in California state court, and then there was a host of non-California residents who also sued in federal court on essentially the same claims. The problem was they weren't residents of California, they didn't engage in transactions in California, and they didn't suffer the harm in California. They weren't defendants. Right, they weren't defendants in the second case. Right, but BMS, Your Honor, I apologize. BMS was the defendant. BMS challenged personal jurisdiction. The court said, yes, we've got to look at jurisdiction over those claims. And if merely the fact that BMS was in court defending the same claims anyway, this kind of convenience argument that the plaintiff suggests, BMS would have come out completely differently. So I think the other case I've mentioned, I'd say it's less on point, but this court's decision in Sunward, which talks about that personal jurisdiction has to be determined claim by claim. I mean, that's the whole nature of specific personal jurisdiction, as opposed to general personal jurisdiction. For specific personal jurisdiction, the contact has to be linked case-by-case. But the question is whether or not the lawsuit that you voluntarily engaged in established that. I think I understand that. Well, let me give you very quickly on that, because I think that's a different but important point, because the plaintiffs have argued neither for consent. What Takeda said in his answer is that it acknowledged that jurisdiction existed in the case. But what the district court found below, and what numerous courts of appeals have found, is that unnamed class members are not before the court at that time. So Takeda could not waive a challenge that it was not permitted to bring. That's the Moser decision in the Fifth Circuit. The Cruzon decision, excuse me, Moser was the Ninth Circuit. Cruzon's Fifth Circuit, it held there was no waiver for just the reasons I described. The Moloch decision in the D.C. Circuit, I'll do a quick quote. Quote, it is class certification that brings unnamed class members into the action and triggers due process limitations on a court's exercise of personal jurisdiction over their claims, close quote. And the Lindgast dissent, and it's the dissent, but the Lindgast dissent has a very good discussion there. This court's decision in police and fire, which we cited, also makes the observation that until certification, there is no class action but merely the prospect. It's only that the only action is the suit fought by the named claims. And there's a very practical, and this case illustrates the point. Therefore, the amended complaint alleged a class on behalf of all persons or entities in the United States and its territories, nationwide. The class that was certified here, the district court certified here, was limited to residents of 22 class states, none of which is New York. It's a moving target. It would have been premature under the authority I gave you to challenge personal jurisdiction at the beginning of the case. And here we are now with the class before the court. And, again, what we're urging is not that the – I want to be very clear about this, please. We're not saying that all unnamed class members have to come before the court and prove some evidence of personal jurisdiction over Takeda. What we're suggesting is the very rule that this court applies under Denny as the subject matter jurisdiction, which is no class can be defined in a way that would include class claims as to which the court lacks jurisdiction. It's a much more efficient approach that would satisfy – would balance the competing considerations, I submit. Your Honor, I'm well over time. There's one other challenge that's in our papers as to the post-trial process employed in the EPP case. I'm happy to address it now, but I'm also conscious of the time. Why don't we address it on rebuttal if you wish? So let's reserve five minutes of rebuttal time. Thank you, Your Honor. Good morning, Your Honor. Steve Shadowin on behalf of the unpaired class plaintiffs. What Takeda is asking for is for this court to inaugurate a revolution in class action litigation. Three courts of appeals have addressed the issue that my brother has raised, and they've all gone in favor of the plaintiffs, and they've rejected this notion that the absent class members have to independently establish personal jurisdiction over the defendant. If there ever were going to be a revolution in class action litigation, this is about the least likely case to found it on because of the factual record in this case, among other things, as Your Honor alluded to. Takeda waived personal jurisdiction. My colleague referred to their- But why wasn't this the first possible opportunity they had to raise the objection? I mean, we haven't ruled on this in a specific way, but circuits that have generally say that the right moment is at classroom. Did they really waive it? I mean, you can ask us to reach it, and you can ask us to decide in your favor, but did they really waive it? Yes, they did. The cases that have gone the way in terms of when to make a motion to dismiss those claims or to attack the class certification based upon personal jurisdiction, yes. That's a particular interpretation of Rule 12G, whether or not the defense was, quote, available to them before the time that they raised it. We have that argument. We think it's a good one, but that's not where we're hanging our hat. We hang our hat on a much more basic proposition, Rule 12B, the first sentence. If you have an affirmative defense, you must assert it in a response of pleading. That is, in the answer. Takeda filed an answer in this case. But hasn't every circuit to address the issue essentially rejected that sort of argument? No, Your Honor. In every one of those cases, the defendant asserted the affirmative defense of lack of personal jurisdiction in the answer. And the reason that's so important, look, we're talking about, we think we can establish already on the facts that happen to have been developed that in fact the absent class members could establish personal jurisdiction here if it were necessary. But look at the position they put us in. They did not raise personal jurisdiction as an affirmative defense in their answer. By the way, they did raise three other defenses specifically related to class actions, whether or not there's an injury. But unnamed class members aren't parties until certification, right? So why would they have been required to raise it at that time? Because they're filing a response of pleading to our complaint, and our complaint alleged a class action that clearly included plaintiffs that were outside of New York. Let me get you to address the argument that was raised about approximate cause. I'm sorry, Your Honor. I think his colleague. My colleague who represents the direct purchaser plaintiffs will address that issue. I'm only on behalf of the plaintiffs. If we disagree with you that it was waived, what is the best argument you have? Well, I've got plenty to choose from. Three courts of appeals have gone our way, including most prominently the Musset case written by Chief Judge Wood on a panel that included now Justice Barrett. But I understand you're more interested in the substance. The court said that it had been the consensus for decades that federal courts can entertain nationwide class actions, or less than nationwide in our case, without the absent class members having to independently approve personal jurisdiction. The court also noted that the Supreme Court itself in the Wal-Mart case, in the Schutz case, in the Califano case, had entertained cases where it was clear that the class members did not independently satisfy personal jurisdiction. And I think the most important thing is this. The language of the rule, the very nature of a class action. Takeda wants this court to treat a class action as if it were just some other run-of-the-mill way to aggregate claims. They want to act as if we're coming into court on behalf of 300,000 consumers rather than a class of consumers. The very first sentence of Rule 23 is that a member or members of the class may be, quote, representative parties on behalf of members of the class. This is not simply an aggregation of individual claims. And as Your Honor pointed out, Rule 23 then, in substance, ensures that the defendant is confronted with a single unitary claim. It does that through the requirements of common questions, of typicality, that the name plaintiff's claims have to be typical of those of the class, and that the common questions predominate. All of those requirements protect the interest of the defendant who is properly in the court based upon the personal jurisdiction of the named representatives. It doesn't really help us all that much to distinguish this case from Bristol-Myers, though. I mean, Rule 23 is really about the relationship of the representatives to the other class members. Is it really enough? I mean, it's not so different from Bristol-Myers itself, where you're bringing in claims that are similar but that occurred elsewhere. And I'm not sure it satisfies the fairness of the defendant that Bristol-Myers suggests we have to focus on. Well, Bristol-Myers, the assertion by the plaintiffs in those cases was that the claims were similar. But every single one of those claims was going to be subject to individual defenses as to whether or not the plaintiff took the drug, that they take other drugs. It was all going to be bound up with just a plethora of individual issues. And Rule 23, with respect, Your Honor, yes, it protects the interest of the absent class members, but it equally protects the interests of the defendants. The defendants are mostly interested, in example, in that the claims be typical and that the common issues predominate. I do also want to address my colleague's assertion that it was action by Congress that allowed, with respect to the subject matter jurisdiction issues of diversity and amount and controversy, it was action by Congress that allowed the courts to not impose those requirements on the absent class members. And that's simply not true. In the Devlin case decided in 2002, the Supreme Court said, we will not consider the citizenship of absent class members in determining diversity of citizenship. And for all the sorts of reasons that we've been talking about, it doesn't respond to that Rule 23 otherwise protects the interest of absent class members. Yes, Congress did eventually, in 2005, three years after Devlin, enact the Class Action Fairness Act that essentially said the same thing that Devlin said. You don't look at the diversity or the citizenship of the absent class members. So it's not action by Congress. It was action by the Supreme Court, even in the context of subject matter jurisdiction, which the Supreme Court also, in the Insurance Corp of Ireland case, which is cited in our briefs, said, quote, the concepts of subject matter and personal jurisdiction serve different purposes. And these different purposes affect the legal character of the two requirements. But even with respect to the more salient or difficult and important issue of subject matter jurisdiction, the Supreme Court has said you don't look at the interests of the citizenship of absent class members. Counsel refers to the Supreme Court's case in TransUnion. The issue in TransUnion was that neither the class representatives nor the absent class members had standing to assert those claims. It had to do with false credit reports that were put into the client's files. The named representatives had their, those credit reports were actually published to the public and defamed them. So you had a concrete injury. Can you explain to me why we shouldn't treat subject matter jurisdiction and personal jurisdiction the same? Well, I think it's more subtle than that, at least in my mind. That is, if personal, if even with respect to subject matter jurisdiction, for certain purposes you don't consider the class members, then it follows our fortiori that you don't do it with respect to personal jurisdiction. But it is not true that if for some purposes you have to look at the class members, if you have to do that for subject matter, you also have to do it for personal jurisdiction. Personal jurisdiction is a lesser interest as the Supreme Court in the Insurance Court of Ireland and other cases has consistently made clear. And I will note that counsel refers to this court's decision in Denny, which was a subject matter jurisdiction case. But in fact, the subject matter jurisdiction case that's most parallel, almost on all fours with this case, is Langdon. Because there, there was a consumer protection case based upon Connecticut law that the name representatives had, and essentially the same claim, but under the laws of other states that the absent class members had. And this court had no trouble at all saying it's the same claim, same interest, same injury. Yes, it's true that the class members must have standing, but we're going to analyze that issue as one under Rule 23. We're not going to have 300,000 absent class members come in here and show us that they have standing. So you're saying that Rule 23 is the mechanism by which we make sure that whatever due process violations there might occur from bringing an unwilling defendant into another state gets addressed. I believe so. But obviously, you also, we also have to satisfy the requirements of due process. But I think, in essence, what Congress has allowed under the Rule 23 is this is the process that you're due in these circumstances. Once the name plaintiffs establish personal jurisdiction, it is a representative action. The name plaintiffs are not just two out of 300,000 plaintiffs. They are the representatives suing on behalf of, in essence, what becomes at class certification a separate legal entity, which is the class. Let me make sure I've hit everything I need to hit. I would just point out that Lynn Goss emphasizes that the defendant, as a result of the requirements of Rule 23, is presented with a unitary, coherent claim to which it needs to respond only with a unitary, coherent defense. And then Fisher goes even one step further and says, in essence, that the class acquires an independent legal status. And I guess if we were to disagree with much of your argument today, I'm not saying that that is the case, but you also argue in your brief that class members could establish personal jurisdiction under the long-arm statute in any event. That's absolutely true, Your Honor. And I do have an additional citation for you here. It's not in our brief, but I would point you to make the connection. What is the absent class member's connection with New York? That it isn't just where the injury occurred, it's that Takeda's conduct occurred with respect to New York. And that's our opening brief on class certification below. It's at ECF 587 at pages 6 to 9. And what it shows is that Phil's New York patent litigation was ongoing. The FDA asked Takeda, hey, are you really sure? Are you really telling us that your drug claims this product? We found in discovery that Takeda discussed that issue internally and said, in essence, you can read their own document. Their document is eye-popping. They say, we have to answer the question this way, that is, untruthfully, because we need that. Without that, we won't have the leverage to get a good settlement in the New York patent litigation. And for them, a good settlement was delaying generic entry by an additional two years. It's right there in black and white in their document. So if the absent class members had to independently establish it, we could very easily. The New York law on what has to be the connection is, in their own language, permissive. That is, does it have some connection to, actually, some arguable connection to the forum context. Can you remind me, I think, so I'm sure, what is your estimation of the size of the class you propose? With respect to individual consumers, it's about 300,000. With respect to end-payer, what's called third-party payers, union health and welfare funds, insurance companies, entities that pay on behalf of others, it's somewhere over 1,000. I do want to say, on the last thing, my point on Denny. There's a dispute between us as to, with respect to subject matter jurisdiction, what's the right authority? Is it Denny or is it Langen? I say it's Langen. He says it's Denny. And again, this is not in our paper, so I'll give you the citation. Highland v. Navient Corp., 48 F. 4th, 110, 2nd Circuit, 2022, in footnote 1. It says, in essence, people are always throwing around this one sentence out of Denny that they're throwing around. And the court says, we acknowledge in Denny that once it is ascertained that there is a named plaintiff with the requisite standing, there is no requirement that the members of the class also proffer such evidence. So, unless there are further questions, I appreciate your time very much. Thank you. Well, good afternoon, and may it please the court. Tom Sobel for the certified direct purchaser class. By the way, thank you very much to this court for your attention. This is the third appeal that we're having in this matter, and I think that court's been sitting on the other part, too. So, cutting to the chase in terms of the question about proximate cause and what is the right test and whether it is consistent with the jurisprudence of this court before, we start with the notion that the Third Circuit has this right, that there is something called market exclusion, conduct that prevents a competitive market from forming at all. And the way that the Third Circuit put this is that where you have market exclusion, all market customers should have antitrust standing to sue those engaged in the anticompetitive conduct because all suffer equally from the foreclosure of choice. Okay, sir, but I want to ask, so you seem to be making a distinction between market exclusion cases, but we do need to come up with a rule that explains all of it, and your colleague offered a rule suggesting proximate cause was the through line through all of these cases. I want to give you the opportunity to tell me what you think our rule is. Yes. That coheres cases like Platinum and Palladium and DDAVP with cases like Amex and Schwab and Leydig and Sullivan. Yes. So, in Schwab, as an example, the court explicitly said that... I'm sorry. So, again, we can think of these cases as a bunch of pinpricks, and we can decide that this case can be distinguished from this case, which can be distinguished from this case, which can be distinguished from this case. Your colleague offered a harmonized rule that cuts across all of them, so I would encourage you to think about whether or not you want to tell me this case is different from this case or this case is different from this case, or whether you have a countervailing explanation of what the rule is that makes all of these cases make sense together. So, the proffered rule by defense counsel, by Mr. Reeve, that you have to be a purchaser from the defendant is not the rule. Schwab, 22F4F117, this court explicitly said, umbrella status does not decide the issue. Your status of being outside of the purchase from the defendant is not the rule. I propose, as a rule, that there is a distinction between two classes of cases that we've talked about here today. One class of cases is where the defendant has done something with respect to its prices to its customers, and there's some knock-on effect that it has to the defendant's non-customers. That's one class of cases. That's cases like Amex, like Schwab. Then there's another class of cases where the defendant's conduct is market exclusion, meaning, as what happened here, that for two years Takeda prevented the United States market for P. O. Glitisone from becoming generic, from becoming competitive. And during that two years, anybody who would have bought the brand or the generic during those two years were denied an opportunity to do so. Now, I would suggest that not only do I have precedent for that outside the circuit, but I would suggest that my market exclusion test is clearly suggested in the jurisprudence of this court. So I'm not trying to distinguish one case from another. I'm trying to show you, Your Honor, what is it even in your own jurisprudence. So it's this. First, in Schwab, we have the identification that I gave to you. Second, in Schwab, the court said, there's no allegation in Schwab, this court said, there's no allegation that banks controlled the market for LIBOR-referenced products, suggesting, in other words, that the decision might have been different if that defendant did control the market, which Takeda clearly did here, because it was the only seller of Pia Glutasone in the United States. Schwab also said the defendants did not control the relevant transactions. And yet, in a market exclusion case, by definition, here, Takeda did control the market for those two years, prevented the direct generic purchasers from buying the generic during those two years, and also then resulted in the situation that when they eventually were into the market, they had a different market condition. They obviously didn't set the price because the generic manufacturers that were selling were selling at. Well, yes and no. Takeda had 100% control over the only available list price in the United States, the wholesale acquisition cost, or the WAC, for this product. As this court knows, there are thousands of drugs in the United States. Each one of them, for brand drugs, each one of them, at any one point in time, has an identified wholesale acquisition cost for each dosage form and each package type for that drug. It is 100% controlled by Takeda. And the undisputed evidence in the record is that if you delay, by precluding generics from the market for two years, not only did Takeda increase that WAC during its preclusion period, but it also delayed the entry by two years, so you prevented the market dynamic of lowering price in the meantime. While the prices might have been negotiated differently on transactions, they were all starting from a C level by controlling the market that Takeda had. I want to go back also to the point about how my market rule fits platinum. So there were two groups in platinum that were before the court there, the KPFF plaintiffs and then the exchange plaintiffs. And the exchange plaintiffs had antitrust standing. And there, what the court pointed to as to why it was that the exchange plaintiffs would have standing but the others did not, and it's this. First, the court said the defendants are large participants in the NYMEX futures, meaning that they were in a position to control the market of NYMEX futures, much like Takeda here, even more so Takeda here, had 100% control of the market. The court said the defendants profit at the extent of the exchange plaintiffs by manipulating the market as a whole. So it wasn't that the defendants, as the exchange plaintiffs in platinum, were benefiting from specific transactions with their customers. The court said, no, the defendant is benefiting by manipulating this market as a whole. And then third, this court said in platinum after the same group of plaintiffs, the inability to tie specific transactions from the defendant to particular participants in the NYMEX market is not dispositive here, much like we would have here. So I would suggest that those two readings of those two cases carefully. What about NYMEX and Sullivan? In neither of those two cases was there a market issue that needed to be distinguished. In both of those cases, you're talking about knock-on effects from the defendant's actions towards the defendants plus customers that then some other participants were taking advantage of. You did not have the market issue there. In contrast, every jurist since Badafinal has decided this issue our way. The Third Circuit's looked at this, as I pointed out, and has decided it our way. Judge McMahon in Nomenda decided it this way in a thoughtful opinion. Judge Smith in Lowestern did. The district court in the NYMEX case even noticed that Nomenda, the drug situation, is different than a situation like NYMEX. Judge Chen in HIV also identified this. And, of course, the two jurists below in this case also ruled that way. I'll finally also suggest that this makes infinite common sense to draw this distinction between a market exclusion and knock-on effects from individual transactions. And it's this. Take a look at what happened here. For two years, Takeda was able to prevent the United States market for pioglitazone from becoming generic. During that time, there was complete exclusion by any payer of any kind during that period. In the meanwhile, Takeda was able to increase its WAC in a manner sufficient enough such that these class members, when they paid for 224 million pills when the product eventually did become available, were paying, on average, a dollar more per pill. Can you do me a favor and explain the precise relationship between the price of a name brand drug and the price of a generic entering the market? Yes. So, in the United States, a brand name drug, the brand name drug maker lists its wholesale acquisition cost, its WAC. That product is then sold from the manufacturer to a wholesaler, typically at a 2% farm pay discount. And then that product makes its way down the marketplace. But that's the basic thing for a retail pharmacy brand drug in the United States. For a generic drug, the generic drug launches its drug at a discount off of WAC, meaning it looks at the brand drug's WAC and then it sets a published discount off of WAC at which it's going to make available into the marketplace. And then that drug maker, the generic drug maker, negotiates sales based upon a discount off of WAC. Okay, but it's done by generic manufacturers at an individual decision that's being made, right? Yes. Okay. Yes, they are doing that. Your colleague on the other side would say that that breaks a proximate causation, right? If there can be a price being set by a billion different people for whatever idiosyncrasies they have, how would you respond to that? So what I would suggest to that is this. There are idiosyncrasies, there are decisions that are going to be made in that negotiation, but they are all starting at a different point, which is by market exclusion for two years, two things have happened. The WAC has gone up from which those transactions are being negotiated and it's being delayed. In other words, the ability of that market to have competed itself down over two years has also vanished. What would you say to the argument that the different idiosyncratic choices being made by generic manufacturers just turns this into a price-seeing activity like what we see in AMEX or Schwab? Again, what I would suggest is that the distinction here is this. Unlike AMEX and Schwab, where there is no market exclusion and therefore no activity that the defendant has done to harm those other transactions, which is really the key, here at the first step, by excluding these generic purchasers from the beginning during that two-year period, you have at the first step were injuring them right from Jump Street. And that is the difference here. And that's the difference that's being seen in the case law, even of this court, in Schwab and in Platinum, where it's talking about, no, we don't see any market effects here. To put it differently, Your Honor, just to make it clear, what cases like Schwab and Platinum, when they're talking about market effects, and you're talking about Medafinil here, market effects, they're all talking about how, no, if you, at the outset, if your conduct is directed toward a market and you're influencing, you're changing the dynamics in that market, sure, there are going to be differences in the way that people are affected by that, but no, we're not going to deny antitrust standing to the people who you deny access to a competitive market. We're going to give them antitrust standing. But if I'm purchasing from a generic, look, this is on the other side of the two-year period, what's to prevent me from negotiating with the generic about what I'll pay, and if you don't give me the price, I'll go down the street and get a better price? Nothing is stopping you from doing anything. What you are doing is you're participating in a fundamentally different market, because you're now participating in a market that wasn't available two years earlier and is at a higher C level, a higher WAC price. So no matter what you do, and yes, you can try to do all sorts of things. You can give your, I remember when I was a kid, sometimes the distributor would give somebody a bottle of scotch at the end of the year, and that was a way to be able to get a better price. You can do all that. But market exclusion cases means you're still dealing with this in a completely different setting, and that's why the distinction lands you on it. If I may, can I ask you to talk about the other factors?  Oh, the other efficient enforcer factors? Yes. So... Okay. Okay. The second factor is, is there an other identifiable class to vindicate the antitrust enforcement issue? Now here, the defendants would argue, well, the brand purchasers that could not buy the generic during the two-year period of foreclosure, they have a right to recover, and we agree with that. However, there is no one available other than these direct generic defendants to recover for the harm that was caused by increasing the generic price when it eventually became available. That market harm is only recoverable by the 50-odd members of this class who seek to be able to recover for generic damages. The third factor is whether it's highly speculative. Here, it is not highly speculative. Why? Well, because by definition, we have the price at which the WAC was increased during that period of time from which reasonable estimates may be made, and we also know how much the competitive price can go down over a two-year period of delay, and so we're able to be able to satisfy that. And then finally, the fourth factor is whether there's duplicative recovery. But by definition, what we've done in this circumstance is we've ensured that there's no overlap whatsoever. The direct purchasers are recovering for their direct purchases from ACADA, and the generic purchasers are buying from the generics, who they pay inflated prices for. So I won't go through, but when I went through how it is that Amex and Schwab and Platinum dealt with these factors, I think that they're pretty straightforward that we would reach the same conclusion as we would here. There was a part of the argument that was raised regarding whether or not the magistrate judge and Judge Abrams abused their discretion with respect to the other aspects, but I want to simply say on this is there was not only was there ample evidence at the lower court to be able to justify the exercise of discretion the way that the court did, but throughout the United States there has been about three dozen or so of these certified direct purchaser drug cases, and there have been a handful of times where there were so few class members where the lower court denied class certification. And what we now know empirically, and what was before the district court empirically, was that in the wake of not certifying the class, you did not get joiner. Not only of all class members, but even like sometimes not even half of them. The big ones came on board, but the function of the class device, making sure that those with the smallest value claims can recover, did not recover in those cases. And I think that that, among other reasons, served as a sound basis for the court's exercise of discretion in that regard. Thank you. Your Honors, I'll briefly address each of the arguments. I'll start with the DPP argument first since it's most fresh. Just one quick point of clarification on the 23A1, when Judge Abrams considered the possibility of delay, that was a legal error. That's subject to de novo review, not an abuse of discretion standard because we argued that she misapplied the law. In terms of the standard, and Judge Perez, I understand the desire to really kind of hone in on the right test, the right articulation of the first step rule. I would respectfully suggest that the court has done that multiple times. Most recently in 2025, in the Sullivan decision, quoting the Schwab decision, Judge Lewison, you were on that panel, where the court says, we have clarified that, quote, the first step rule and traditional proximate cause considerations require drawing a line between those injuries resulting from their direct transactions with the defendants and those whose injuries stemmed from their deals with third parties. The former suffices while the latter does not. That is the law in this circuit, articulated by multiple panels most recently last year. Even the direct TV case, which involved, again, a different type, different theory of harm, and it was a lost profit remedy, this court repeated that standard, that test. And I won't read out to you all its recitation of the decisions in Schwab and Platten, et cetera. But one of the interesting things that the court said when explaining its conclusion that Schwab was an efficient enforcer in that case is that direct TV, not Schwab, excuse me, direct TV was the counterpart negotiating with the plaintiffs. It suffered a direct injury from the defendant's coordinated price demands in those negotiations. The theory of antitrust injury here does not depend on the reactions of other market participants who themselves transacted directly with the defendants. That was true there. It's not true here. This is, I would refer your honors to CAA 23. I'll hold it up, but this is from our expert report, Dr. Baker's expert report. What you'll see in this graph are all the plot points, all the different price points. Manufacturer by manufacturer, customer by customer. Ms. Parker, this goes to your question. Absolutely there were negotiations. There were third-party negotiations that Takeda had nothing to do with, was not involved in at all. This breaks, pardon? Between, among the generics, how much price variation did you see? Well, I would say significant, your honor, but I guess I'm not conversant enough with the facts to tell you. But it was, it varied. What you'll find is even the prices that a given customer would pay varied, depending on the manufacturer with whom it was dealing and the terms of the contract that it had negotiated. If the WACC had been different, wouldn't the negotiations all have been different? Perhaps, your honor, but again, that brings us back to American Express. The argument that the non-American Express merchants made was that the prices that they paid, the prices they were charged by American Express's competitors were driven up by the conduct, by American Express's conduct. So they fell within, under the umbrella of higher prices that American Express was able to command because of its violation. So it, I mean, I think this law, the court's very clear and for very good reason. And that's why you asked a little bit, so you asked a little bit about. Your adversaries would say your client benefited from the market exclusion. So, yes, there were separate negotiations with the generic set their own price, but American Express did not involve the same benefit directly to the defendant. Yeah, so we didn't, like American Express, we did not benefit. Their entire theory of the case is that we were seeking to delay generic competition so that we could maximize. You benefited from the market exclusion. So you benefited from the fact that the generics were operating in this excluded market in which they were receiving more than they would have in a market in which your client had let others enter. Well, we absolutely did not benefit from the prices charged by our generic competitors. Our goal was not to raise their profits, not in the least. And as the plaintiffs will tell you in these cases, the rate, the very rapid rate of generic conversion because of the state laws that mandates generic substitution. But there's no allegation and no proof that we were able to demand higher prices or make more profits because of the particular price that the generic competitors charged. I mean, not the particular price. Right. But the exclusion. Right. But again, here's why, and I'm sorry. No, go ahead. Wait a minute before. So the efficient enforcer test is, you know, is drawn from American general contractors, right? It's AGC. It doesn't ask, does everybody have a claim? Is every harm, is there a claim for every harm? The answer, I mean, it's implicit in the proximate causation of harm, that there may be harms as to which that are down the road that are not, that as to which there's no standing to assert them. That's why you talk a little bit about the other factors. Is this an antitrust violation? If it is one at all, it will go unnoticed and unremedied. Well, the direct purchasers, those who transacted with Takeda, are suing for billions of dollars. This case is not going away. Takeda, if it's liable, it's not getting away with anything. The third factor is what you have to speculate. Here again, where you have multiple third-party transactions, the court, in order to determine damages, you would have to predict the pricing decisions of third-party generic manufacturers and buyers and how they would have been different in a world in which Takeda hadn't engaged in the challenge conduct. And then the fourth element, and by the way, not all of these are required. Schwab, often it's the first step that is the last step. But ask the question, is there duplicative recovery? Well, what hasn't been said here, but should be said out loud, is these wholesalers are in the business of buying drugs and selling them for a profit. The end payers are in here saying that they're the ones, if you read their first page of their brief, refoot the bill. They are claiming that these overcharges were passed through to them. There are many reasons why this court should conclude that the generic-only purchasers are not efficient enforcers under the long-established case law in this circuit. I'd like to respond to this. I want to be quite clear that I understand your position with respect to the DPP folks who are not buying from generics. What's your objection to a class that encompasses just them? So, Your Honor, I don't yet have an objection to that class because that class has never been proposed. Our argument is that at most 30 companies purchased directly from Takeda, we don't challenge those entities' standing, antitrust standing. The next step that the plaintiffs were required to take was to meet their evidentiary burden under Walmart and Robito and show that a class of those 30 sophisticated drug wholesalers is necessary because joinder of them would be impractical. They didn't even try to make that argument. That wasn't their motion. That wasn't their argument. They didn't put in evidence to that effect. The court never addressed that. I'm conscious of the time, but I really would love to touch briefly on the EPP. So, Mr. Shadowin started his argument and ended it with the notion that our position is that absent class members are required to establish, independently establish, personal jurisdiction. He read from a case that talked about proffering such evidence. To be clear, that's not our position at all. Our position is the Denny approach. They don't have to require them to proffer evidence, but you can't define a class that on its face includes claims as to which the court lacks personal jurisdiction. Mr. Shadowin also said that each of the three circuit court decisions that I cited on the waiver point involved cases where the defendant asserted personal jurisdiction as a defense in his answer. Well, that's the first time I've heard that. I literally don't know whether that's true or not, but what I do know for sure is that none of those decisions turned on whether an affirmative defense was stated in the answer or not. And, again, because time is short, I won't read the quotes to you, but Moser, in particular, is a waiver case, and I commend to the court. But it's very clear that the reason why those three circuit courts concluded there was no waiver was because the unnamed class members were not before the court until certification. Before then, it would be premature to address. EPPs, you know, we made the point that the Supplemental Jurisdiction Act and Class Action Fairness Act were congressional amendments to the party's rights. EPPs didn't address that argument in their brief, but today we heard about Devlin, the Supreme Court's decision in Devlin. Devlin involved the ability of absent class members to appeal from a settlement. It's not on point. I want to talk briefly about the New York long-arm statute, and I will be very brief. One plaintiff's alternative argument is that, well, there is jurisdiction anyway, right? And that's just not true. I'll run through it quickly, but Dow, the Second Circuit's decision, says there has to be a substantial relationship between the New York contacts and the claims. The New York Appellate Division decision in Talbot says mere links in the chain are not enough. That's all they have here are links in the chain. They point to the New York patent litigation and settlement. By the way, they had brought claims based on those settlements to this court. Those claims were dismissed. Their case isn't about those settlements. Their case is about representations made outside of New York to the FDA in D.C., and then an attenuated chain that goes beyond that. But then, as Mr. Shadowin acknowledged, even if they got past the New York long-arm statute, they still have to wrestle with federal due process, BMS, and the Ford decision. And the Ford Supreme Court decision, I turn your attention to a footnote, footnote 3 in that decision, which gives the example of an Ohio resident suing in California based on an accident in Ohio in a car purchased in Ohio as an example of clearly where there wouldn't be personal jurisdiction. That's on all four with our case. In terms of, you know, what's the big deal? We're in court anyway. You know, we agreed to a few claims. Daimler, Supreme Court's decision, Daimler. It's like in for a penny doesn't mean in for a pound. Thank you. Thank you, Mr. Reed. Thank you, Your Honor. And I apologize for that. Thank you all. Yes. No, I don't apologize at all. Very helpful from all of you. Extremely helpful. And we'll take a matter of your time. Thank you.